**DYNAMIS LLP**
Constantine Economides (CA SBN 363454)
Eric Rosen (*pro hac vice* to be filed)
Kaitlyn Gerber (*pro hac vice* to be filed)
Tyler Finn (*pro hac vice* to be filed)
175 Federal Street, Suite 1200
Boston, MA 02110
Tel: (305) 985-2959
Email: ceconomides@dynamisllp.com

*Attorneys for Plaintiff Harpreet Singh Rai*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND/SAN FRANCISCO DIVISION

| | |
|---|---|
| HARPREET SINGH RAI, | Case No. |
| *Plaintiff*, | **COMPLAINT** |
| v. | **1. BREACH OF CONTRACT** |
| OURARING INC., OURA HEALTH OY, | **2. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING** |
| *Defendants*. | **3. UNJUST ENRICHMENT** |
| | **4. PROMISSORY ESTOPPEL** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff Harpreet Singh Rai ("Plaintiff" or "Rai"), by and through his undersigned counsel, brings this Complaint against Defendants Ouraring Inc. ("Ouraring") and Oura Health Oy ("Oura Oy") (collectively, "Defendants" or "Oura") and alleges as follows:

**INTRODUCTION**

1.      This case is about a CEO, Harpreet Singh Rai, who saved Oura—a fledgling "wearable" ring company founded in Finland—and built it into a thriving business worth billions of dollars. In response to that success, Oura reneged on paying him the millions of dollars' worth of equity compensation that he was owed.

2.      Plaintiff Harpreet Singh Rai was one of the first purchasers of an Oura "wearable" health and exercise ring, a ring that is now prolific amongst individuals tracking their health and sleep patterns.

3.      In 2016, when he was working full-time as a Portfolio Manager at a New York City hedge fund, Rai wore his Oura ring when shopping at a Whole Foods and serendipitously ran into Kari Kivelä, one of Oura's founders. The founder immediately noticed Rai's ring, and the two began speaking about wearables.

4.      This chance encounter ultimately led Rai to quit his lucrative hedge fund job and devote his life to Oura. Rai became one of the first non-Finnish investors in Oura, investing $1 million in Oura's Series A financing round. Rai's personal contributions comprised 20% of Oura's total Series A funding, and he raised from his personal contacts all but $600,000 of the remaining funding.

5.      At that time, Oura suffered from severe financial troubles, struggled to pitch investors successfully, and repeatedly ran out of capital.

6.      Oura's founding leadership (based in Finland) quickly recognized Rai's contributions to the company.

7.      In May 2017, Oura's founders recruited Rai to serve as President of the company. At that time, Oura had 15 employees and was selling approximately 10 rings per day. Working as an

**COMPLAINT AND DEMAND FOR JURY TRIAL**

independent contractor, Rai agreed to accept a modest $100,000 salary and was granted a number of shares that, at the time, constituted 5% equity in Oura.

8.    Because Oura was struggling financially, after the initial round of Series A financing, Oura engaged in three more tranches of Series A financing. Rai became President after the first financing, in May 2017.

9.    In April 2018, Oura's Board appointed Rai as the company's Chief Executive Officer ("CEO"). Rai became one of Oura's 40 full-time employees, and he poured his life into the Company. Under Rai's leadership, the company grew exponentially in sales and revenue. Share prices grew, and in November 2018, Oura raised another $5 million.

10.    Rai then led Oura through a successful Series B financing round, raising approximately $28 million for the company.

11.    Pursuant to Rai's written employment agreement, the closing of a Series B financing entitled him to additional stock options, which would bring his holdings back to 5% of equity in Oura (his share of equity had been diluted in the interim by successive rounds of fundraising). Those additional stock options were scheduled to vest over a 42-month period.

12.    Rai trusted Oura to honor their agreement. Rai worked tirelessly to grow the company with the understanding that Oura's Board of Directors would make good on their contractual promise to grant him stock options, according to the vesting schedule outlined in his employment agreement. Oura's Board repeatedly assured Rai that they would grant those options.

13.    And those assurances were well-deserved. Rai's tenure as CEO of Oura was a resounding success. Under Rai's leadership, Oura grew its headcount by 20x, multiplied its revenue by 100x, and secured over $200 million in funding. Oura's estimated share price as a private company increased from $7 in April 2018 to approximately $100 by December 2020.

14.    Given this success, Rai initially did not push the Board to formalize further details of his agreed-upon options package. In early 2021, the Board began discussing executive compensation. Rai believed that the issue of his compensation would be rectified.

DYNAMIS LLP

3

15. In May 2021, Rai's initial tranche of stock options (from May 2017) fully vested, but the Board still had not addressed Rai's compensation. Rai requested that Oura's Board formally vote to grant his allocated stock options with vesting to begin retroactively on the date agreed upon in his employment agreement—a procedure that, based on the Company's practices, Rai understood to be a formality.

16. Oura's Board, however, refused to provide a substantive response to Rai's request. Instead, the Board disavowed the options grant in Rai's employment agreement and instead purported to commence "negotiations" about the previously granted options.

17. To his detriment, Rai accommodated Oura's Board of Directors and negotiated in good faith for months. Rai believed that the Company—valued at over $2 billion by potential investors at the time—would comply with its promises to the CEO who had generated meteoric growth.

18. During these negotiations, as the Company dallied, Rai spearheaded the launch of Oura's third-generation Ring, scheduled for October 15, 2021.

19. On November 12, 2021, however, Oura told Rai that the Company was refusing to make good on its contractual promises, and would not formalize the grant of any additional equity. This decision breached the terms of Oura's written agreement with Rai. In effect, Oura decided to place itself firmly at the bottom of all tech startups in terms of executive compensation—even though its CEO had unequivocally surpassed all Company targets, and even though Oura's shareholder returns were in the top 1% of all Venture Capital-funded companies.

20. Making matters worse, Oura made the decision to terminate Rai's highly successful employment at Oura without cause. Further revealing its bad faith, Oura falsely told Oura employees that Rai had resigned.

21. At the very least, this unjustified termination entitled Rai to nine months of severance pay, totaling $225,000. Oura also refused to pay that money as well, in further breach of the employment agreement.

Dynamis LLP

4

22.     In sum, Rai saved Oura from demise and generated revenues of more than $100 million a year, all the while accepting severely below-market compensation in reliance on the Board's promises of options. In exchange for that work, Rai is owed the agreed-upon consideration, which includes considerable vested stock options.

23.     Given Oura's unjust decision to withhold duly earned valuable compensation, Rai brings this action against Oura to recover his rightful stock options and severance payment.

## PARTIES

24.     Plaintiff Harpreet Singh Rai is a citizen of New Hampshire who resides in Meredith, New Hampshire. He served as the CEO of Oura from 2018 to 2021.

25.     Defendant Ouraring Inc. is a Delaware corporation with its principal place of business at 222 Kearny Street, 7th Floor, San Francisco, California.

26.     Defendant Oura Health Oy, formerly known as "JouZen Oy," is a Finnish company with its principal place of business at Elektroniikkatie 10, 90590 Oulu, Finland. Oura Oy is the parent company to Ouraring.

## JURISDICTION AND VENUE

27.     The Court has jurisdiction under 28 U.S.C. § 1332 over all causes of action alleged in this complaint because complete diversity exists between the parties and the amount in controversy exceeds $75,000.

28.     The Court has personal jurisdiction over Ouraring Inc. because it is headquartered in San Francisco, California and has general and systematic contacts with the State of California.

29.     This Court has personal jurisdiction over Oura Oy because Oura Oy operates its United States headquarters in California, and extensively markets its products through Ouraring in the United States, including California. Oura Oy also specifically engaged in the transactions with Plaintiff described herein, including appointing Plaintiff as Oura's President and later CEO; appointing Plaintiff to Oura's Board of Directors; accepting Plaintiff's services in those roles from Oura's California office; and executing an employment agreement with Plaintiff in San Francisco, California. This lawsuit arises out of those transactions.

DYNAMIS LLP

COMPLAINT AND DEMAND FOR JURY TRIAL

30. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2), (c)(2), and (d) because Defendants are subject to personal jurisdiction in California and because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

**A.    Oura Recruits Rai to Lead the Company After He Invests $1M.**

31. Oura was founded in Oulu, Finland in 2013 by Petteri Lahtela, Kari Kivelä, and Markku Koskela. Oura developed a product called the Oura Ring, a piece of wearable technology that uses sensors to track health metrics.

32. According to Delaware's Division of Corporations, Oura's U.S. entity, Ouraring Inc., was incorporated in Delaware on October 21, 2014.

33. In March 2015, Oura introduced their vision of a sleep-tracking smart ring and launched a Kickstarter campaign in August 2015.[1]

34. Rai purchased the initial generation of an Oura Ring marketed to consumers through that Kickstarter campaign. On information and belief, Rai was one of the first 1,000 people to purchase a first-generation Oura Ring.

35. By early 2016, Oura was struggling to stay afloat. At that time, the company had only 15 employees.

36. On or about April 2016, Kivelä, one of Oura's founders, travelled to New York to attend an industry conference.

37. During that trip, Rai met Kivelä, by happenstance, at a Whole Foods on 23rd Street in New York City. The two men struck up a conversation because Rai was wearing an Oura Ring.

38. At that time, Rai was a portfolio manager and partner at Eminence Capital ("Eminence"), a New York City hedge fund, where he had worked since September 2008.

---

[1] Kickstarter is a global crowdsourcing platform that allows small companies to market their products directly to consumers as part of a fundraising campaign. Typically, consumers pay for products before they are made (thereby providing the company with capital) and receive the products once the company finishes production.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Dynamis LLP

DYNAMIS LLP

39.     Rai subsequently met with several other team members at Oura to learn more about the company.

40.     In September 2016, following his meeting with Kivelä and other Oura team members, Rai invested $1 million in Oura. Rai had never made a private investment of that magnitude before but did so here because he was highly enthusiastic about the product and had studied wearables in college.

41.     Rai recruited other investors to participate in a Series A investment in the company, including future board member David Shuman.

42.     In total, of Oura's $5 million in Series A funding, Rai raised all but $600,000, investing $1 million himself and raising approximately $3.4 million from other investors.

43.     This money was necessary for Oura's continued operations. After the Series A round was complete, Rai learned that Oura owed approximately $2 million in liabilities.

44.     After he learned about the issues with Oura, Rai, while still employed at his hedge fund, decided to help the company grow—by raising revenues and cutting costs.

45.     Rai started running logistics out of his New York City apartment and set up a FedEx account to ship rings and sizing kits to customers. Prior to Rai's intervention, Oura had shipped all inventory from Finland, which was prohibitively expensive. Rai began shipping product himself from New York, which saved the company significant money. At times, Rai would personally deliver rings to potential customers or would drop off the deliveries at FedEx on his way to work at Eminence.

46.     Rai also hired a consultant and began an advertising campaign for Oura, charging the expenses to his personal credit card (which would later become Oura's company credit card).

47.     By the end of 2016, Rai was effectively working full time for Oura, in addition to his full-time job at Eminence.

48.     Oura's founders recognized Rai's dedication to the company, his knowledge of the technology, and his ability to raise money.

49.     Accordingly, Oura recruited Rai to run the business in the United States.

COMPLAINT AND DEMAND FOR JURY TRIAL

50.    Rai decided to resign from his lucrative position at Eminence and assume the role of President of Ouraring.

51.    At that time, the company's valuation was approximately $20 million.

52.    On May 15, 2017, Rai signed an independent contractor agreement (the "Independent Contractor Agreement") with Ouraring. That contract is attached as **Exhibit 1.**

53.    Petteri Lahtela executed the Independent Contractor Agreement on behalf of Ouraring in his capacity as CEO—of both Ouraring and Oura Oy.[2]

54.    The Independent Contractor Agreement made clear that, as an independent contractor, Rai would not be entitled to "employee benefits, such as vacation pay, sick leave, retirement benefits, social security, work's compensation, health or disability insurance or benefits, unemployment insurance benefits, or other employee benefits of any kind."

55.    By its terms, the Independent Contractor Agreement was for an initial term of four months, after which it would automatically continue month-to-month unless either party terminated the agreement with 30-days' notice.

56.    The Independent Contractor Agreement provided: "As part of the Services to be provided hereunder, you will also be asked to accept an appointment as the Company's US subsidiary C-level executive officer on an independent contractor basis. Such appointment and the termination of such appointment is subject to a resolution of the subsidiary's Board of Directors."

57.    Pursuant to the Independent Contractor Agreement, Rai was entitled to a monthly salary of $8,333 a month, equal to $100,000 per year. This salary was far less lucrative than the seven figures that Plaintiff had earned in his last four years as a hedge fund Portfolio Manager.

58.    However, Rai believed that Oura had a bright future, and so he, like many startup executives, joined Oura on the condition that he receive a considerable equity grant. The Independent Contractor Agreement granted Rai "stock option[s] to purchase 142,078 shares of the

---

[2] Ouraring and Oura Oy operate as one entity. Oura's leadership team serves roles in both companies. For example, both Plaintiff and Petteri Lahtela served as CEO of both companies and both companies share the same Board of Directors.

DYNAMIS LLP

Common Stock of the Company." That stock was further memorialized in a U.S. Stock Option Agreement, dated May 16, 2017, that was executed by Rai and Lahtela.

59.    The stock options granted in May 2017 were scheduled to vest completely by May 2021. They represented approximately five percent of Oura's common equity at the time. Today, five percent of Oura common equity is worth approximately $175 million based on Oura's recent $11 billion valuation.

**B.     Rai Transitions from President to CEO of Oura.**

60.    In his role as Oura's President, Rai oversaw all of Oura's marketing efforts and launched Oura's U.S. headquarters in San Francisco, California. To that end, Rai moved from New York to San Francisco in May 2017.

61.    Because Oura had no United States credit history, Oura could not procure its own corporate credit card or loans.

62.    Solely for Oura's benefit, therefore, Rai obtained a credit card under his own name to cover company expenses, which became the company credit card. Rai used the credit card for travel costs and recurring expenses such as document management software, and would submit expenses for reimbursement. Reimbursements would sometimes occur weeks to months later, after Rai had paid interest on the expenses.

63.    Throughout Rai's tenure at Oura, the credit card in Rai's name was used as the company's credit card. Even after Oura terminated Rai, Oura continued to charge Rai's credit card for ongoing operational expenses. At all times, therefore, Rai in good faith incurred personal liability to third parties for debts incurred by Oura in order for the Company to continue operations.

64.    Additionally, Rai's phone number became the default "customer service" number for Oura's customers. Previously, Oura had only offered customer support via e-mail. Oura never compensated Rai for expenses related to the use of his phone number. Rai's number continued to be listed as the Company's customer support number for years after Rai was terminated.

DYNAMIS LLP

65.     Rai also continued investing his own money into Oura's success. In or around June 2017, Rai invested $300,000 of his own money when the company was facing financial difficulties. Oura raised $1 million in that round of funding, with Rai as the biggest investor.

66.     Within eight months of Rai joining as President, Oura's revenues increased dramatically, from approximately $100,000 per month in April 2017 to approximately $1.8 million per month by December 2017.

67.     In November 2017, Oura launched its second-generation Oura Ring.

68.     As the second-generation Oura Ring began to ship, Oura's co-founders and its Board recognized that the company's focus was moving towards execution on sales, marketing and application features, areas in which Rai had made significant contributions to the Company.

69.     Additionally, Rai substantially increased Oura's revenues as President, in contrast to the then-CEO, who had struggled with financial management. In April 2018, just before he became CEO, Rai brought in a new lead investor, Bold Capital, for another round of fundraising that would ultimately raise approximately €5 million.

70.     In light of these considerations, and Rai's experience in finance, Oura's Board decided to make Rai CEO on or around April 19, 2018.

71.     In a July 2018 press release, Oura stated that Rai's leadership and the new funding would propel Oura's growth in the United States.

72.     Oura simultaneously added two board members who were "US industry specialists," Stephen Friend and Kevin Lin.

73.     Kevin Lin became the Chairman of Oura's Board of Directors.

74.     In Oura's announcement of Rai's appointment as CEO, co-founder and outgoing CEO Petteri Lahtela emphasized Rai's central role in the company's future: "I have great respect for Harpreet. He knows the US market and can lead us towards growth and greater market penetration. I'm excited for this next phase for Oura."

75.     Rai's compensation as CEO was significantly below market value. Rai continued to earn a $100,000 salary and his equity in the company was limited to the 142,078 shares granted by

**COMPLAINT AND DEMAND FOR JURY TRIAL**

his independent contractor agreement.[3] That amount corresponded to 5% equity when Rai became President. With each successive round of financing, however, more shares were issued, and consequently, Rai's percentage of equity became further diluted. By the time Rai became CEO, his ownership stake in Oura was closer to 3.5%.

76.  Oura's Board would later describe Rai's compensation as "unsustainable at this stage," meaning that Rai's compensation was significantly below the market value for CEOs of similarly-situated companies.

77.  As CEO, Rai continued to prioritize revenue and growth for the company. The prior CEO had secured three flat financing rounds, all of which failed to secure a cash runway[4] longer than one year.

78.  In a good faith effort to steer the cash-strapped Company toward success, Rai agreed to work for several months without salary, understanding that his salary would be paid back in the future.

79.  In September 2018, Rai and Lin each individually contributed half a million dollars as a short-term loan to help with the Company's expenses because Oura's lack of credit history prevented it from procuring loans from United States banks. Rai provided the money at a rate substantially lower than the market-rate for venture loans. Rai agreed to provide the loan at such a lower rate because he was invested in the company and wanted to see it succeed.

80.  Under Rai's leadership, Oura experienced explosive growth.

81.  Only six months after Rai became CEO, Oura raised another $5 million in its first upseries financing.[5] Rai secured a number of high-profile investors, including Michael Dell (of Dell

---

[3] Upon information and belief, the 50th percentile for non-founder CEOs in the United States as of 2019 was closer to 5.5% of common equity for companies in the Series B stage; for companies in the Series A stage, that number was even higher.

[4] A "cash runway" is the maximum number of months that a company can continue operating at its current spending levels until it runs out of money.

[5] Upseries financing is a round of funding in which a company's valuation has increased from its previous financing round.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

DYNAMIS LLP

computers). Share prices were 30% higher than they had been in May 2018, when Rai had first become CEO—a substantial achievement after Oura's previous financing rounds.

82.    On or about February 2019, Oura hired Michael Chapp as Oura's Chief Operating Officer ("COO").

83.    Chapp also drafted a standard form employment contract template, which Oura used to govern its employment relationships with its United States-based employees. Chapp executed his standard form employment agreement on or about March 26, 2019.

84.    Rai signed Chapp's employment agreement on behalf of Oura.

85.    At that time, it was not the practice of Oura to require board approval for employment agreements.

86.    These employment agreements, along with other key company documents, were eventually stored in Oura's Data Room (the "Data Room"), which was created via Google Drive in or about June 2019.

**C.    Rai Spearheads Series B Financing.**

87.    On or around July 10, 2019, Rai executed a term sheet for a $28 million investment in Series B preferred shares with lead investor Forerunner Ventures, Inc. ("Forerunner"). Forerunner's Managing Director Eurie Kim executed the term sheet on behalf of Forerunner.

88.    Forerunner pledged $10 million in investment in exchange for 8% fully diluted ownership in Oura. Gradient AI and Square, Inc. pledged $12 million between them.

89.    The term sheet provided that Oura had a valuation of $124.32 million, "including a newly authorized and available option pool equal to 10% of the post-Closing fully-diluted capitalization."

90.    The term sheet further provided that "CEO Harpreet Rai and Co-Founders (Petteri Lahtela, Kari Kivelä, and Markku Koskela)" would "retain current vesting schedule for existing options. Any additional options for management team and employees granted will be subject to vesting as follows: 25% to vest at the end of the first year following such issuance, with the remaining 75% to vest monthly over the next three years."

DYNAMIS LLP

91.    Forerunner, through Kim, had originally asked for a 12-point option pool for senior management. This pool would have been slightly higher than the standard pool for Series B companies (which was 10%), but Kim noted that a larger pool would benefit the company in light of Rai's below-market compensation as well as Oura's anticipated hiring needs, which included various open executive positions.

92.    After negotiating with Lifeline Ventures, another investor, Forerunner ultimately agreed to a 10-point options pool instead.

93.    Rai also directly discussed his compensation with Kim, including the possibility that the Board would grant him shares to return him to approximately 5% equity before the Series B round (which would, in turn, be diluted to approximately 4% after the financing round).

94.    In response to those discussions, on or about June 25, 2019, Kim created and circulated a pro forma cap table (the "Cap Table") to Rai and other members of the Board, which projected Oura's ownership structure after the funding round was complete.

95.    The Cap Table showed that Oura's CEO (i.e., Rai) would be granted 2% additional shares, bringing him to 4% of the company's current options pool:



## OURA HEALTH - WIP HIRING PRIORITIES

| Total Fully Diluted Equity Shares: | 7,241,291 |
| New Pool (%) | 10% |
| New Pool (shares) | 724,129 |

| Hiring Plan | Existing Shares | % of FDSO | New Grants | % of FDSO | Total Shares | % of FDSO | Notes |
|---|---|---|---|---|---|---|---|
| **Founders** | | | | | | | |
| Co Founders | 825,500 | 11.4% | 72,413 | 1.0% | 897,913 | 12.4% | |
| **Management** | | | | | | | |
| CEO | 142,078 | 2.0% | 144,826 | 2.0% | 286,904 | 4.0% | Outside CEO usually costs 5-10% ppts |
| COO | 46,000 | 0.6% | 10,000 | 0.1% | 56,000 | 0.8% | |
| CFO | | | 15,000 | 0.2% | 15,000 | 0.2% | |
| CMO | | | 72,413 | 1.00% | 72,413 | 1.0% | Top CMOs can often be up to 2% |
| Head of Mobile Product / CPO | | | 54,310 | 0.75% | 54,310 | 0.8% | Should prob budget for 1% |
| **Team** | | | | | | | |
| Head of Growth Marketing | | | 54,310 | 0.75% | 54,310 | 0.75% | Should prob budget for 1% |
| Head of Data Science | | | 54,310 | 0.75% | 54,310 | 0.75% | Should prob budget for 1% |
| Creative Director | | | 36,206 | 0.5% | 36,206 | 0.5% | |
| Pool for new team hires | | | 72,413 | 1.0% | 72,413 | 1.0% | |
| Pool for existing team | | | 72,413 | 1.0% | 72,413 | 1.0% | |
| Pool for strategic advisors (e.g. Matt Walker) | | | 65,516 | 0.9% | 65,516 | 0.9% | Should prob budget for 1-2% |
| **Total** | | | 724,129 | 10.0% | | | |

*Bold = Role currently filled; others are to be hired

COMPLAINT AND DEMAND FOR JURY TRIAL

96.    In the Cap Table, Kim represented that hiring an outside CEO would have required Oura to grant between 5-10% equity in options.

97.    Kim also discussed the Cap Table with Oura Board Members Timo Ahopelto and David Shuman. This Cap Table was acceptable to Rai.

**D.    Rai and Oura Execute Employment Agreement.**

98.    Prior to closing the Series B deal, Forerunner and other investors had requested and were granted access to Oura's Data Room.

99.    At that time, Rai was serving as CEO without a written employment agreement, working pursuant only to his prior oral agreement with the Board. The COO, Chapp, informed Rai and Lin (who was then the Chair of Oura's Board) that the lack of a written employment agreement between the Company and its CEO could potentially jeopardize the investment, if not rectified. Investors in a startup, like Oura, typically want assurances that the CEO is motivated to remain with the company and, in turn, continue the operational and financial success that had attracted investors in the first place. In other words, it would have been a risk to the Company (and to investors' capital) if Rai—the effective CEO leading Oura's success—lacked the proper incentives to continue leading Oura for the foreseeable future. Accordingly, investors wanted to see (in the Data Room) the CEO's agreement and compensation package so that they could take comfort that the CEO would remain on the job.

100.    On August 6, 2019, Rai and Oura executed an employment agreement (the "Agreement"), which was backdated like the other employment contracts executed by Oura. A copy of that agreement, dated February 25, 2019, is attached to this Complaint as **Exhibit 2**, along with the email through which Lin transmitted the signed employment agreement to Rai.[6]

101.    Rai began receiving healthcare benefits, including dental and vision insurance, in April 2019.

---

[6] Attached hereto as **Exhibit 3** is a copy of a standard form dispute resolution agreement from Oura's files.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

DYNAMIS LLP

102.    Rai's paystubs reflect that he had accrued approximately 143.31 hours of Paid Time Off ("PTO") benefits as of December 13, 2019, indicating that he had been accruing PTO throughout 2019.

103.    The Agreement was executed by Lin, Chairman of the Board, on behalf of Oura Ring Inc., and was stored in the Data Room.

104.    The Agreement was based on Oura's standard employment form template for California employees, which, as explained, was developed by Chapp to streamline Oura's employment processes.

105.    On August 3, 2019, Rai sent a draft of the agreement to Lin, who reviewed it and noticed a mistake in Rai's salary. Rai fixed the error and re-sent it to Lin, noting that the agreement was the same as Chapp's employment agreement, with nine months of severance (albeit with a different, higher salary).

106.    Rai offered to take the option grant out of the Agreement, and to include language noting that his original options grant had been 5%, and confirming that the Board would discuss a new option package after the closing of Series B financing.

107.    Lin asked whether Rai's option grant had been approved in a prior Board meeting. Rai explained that his original grant of 5% grant was approved in May 2017, before Lin joined the Board. Rai offered to include in the Agreement language that would prompt the Board to have a further discussion about his options.

108.    On August 6, Rai followed up with Lin about the status of the Agreement. Lin asked whether the language regarding the options would surprise the Board. Rai responded that it would not be a surprise, and that the Agreement would encourage the Board to discuss the status of his options after the financing round had closed.

109.    Rai further stated that the Agreement mirrored his Independent Contractor Agreement with Oura, which had provided for options worth 5%.

110.    Lin signed the Agreement on August 6, 2019.

COMPLAINT AND DEMAND FOR JURY TRIAL

DYNAMIS LLP

111.    At the time Lin signed the Agreement, he had been the Chairman of the Board for over a year.

112.    Rai forwarded the signed Agreement to Oura's COO, Chapp.

113.    The Agreement set forth Rai's obligations and terms of employment with Oura:

    a.    Rai's job title would be "CEO" and he would be reporting to Oura's "San Francisco location."

    b.    Rai's salary would continue to be $100,000. His salary would increase to $300,000, either at the time of the next financing event exceeding €10 million, or on December 31, 2019, whichever came first.

    c.    If Rai's "work and duties" were "satisfactory" he would be "eligible for additional bonus plans (both cash and equity) …" Ex. 2 at 2.

    d.    Rai's "vesting schedule" would continue per the terms of his original "Contractor Agreement which granted 142,078 shares ('Granted Shares') in the form of options on May 15th 2017, which vested monthly." Ex. 2 at 2.

    e.    The Agreement also provided Rai with additional stock options in Oura, stating: "Furthermore, upon the next financing event an (a capital raise >€10 mm; the 'Financing Event') and approval by the board, additional shares ('Additional Shares') in the form of options will be issued to bring the employee to a 5% option holder of Fully Diluted Shares Outstanding, *which was the amount calculated when the Employee started their contractor agreement in May 2017*." Ex. 2 at 2 (emphasis added).

    f.    The Additional Shares would begin vesting six months after the Financing Event—25% would vest after six months with the remainder vesting over the next 36 months. Ex. 2 at 2. This vesting schedule in the Employment Agreement was also consistent with vesting schedule of Oura stock options that was outlined in the Series B term sheet.

DYNAMIS LLP

g. Rai would be paid severance of nine-months' salary if he was terminated without cause, and during the period in which severance would be paid, Rai would also receive health insurance. Ex. 2 at 3.

h. Finally, Rai was entitled to participate in employee benefits plans, entitling him to twenty vacation days per year, accrued at the rate of 6.7 hours per "pay period" (defined as one month). Ex. 2 at 4. The Agreement noted that "[a]ny unused, accrued vacation will be paid out upon termination."

114. In short, and as relevant here, the Agreement provided Rai with stock options to raise his equity allocation *back* to 5%, consistent with his Independent Contractor Agreement. Those options would be formalized after a qualifying financing event and would be fully vested within three-and-a-half years.

115. The grant of stock options in the Agreement was also consistent with Kim's promises—including the Cap Table addressing the allocation of the new stock options pool, and subsequent discussions with Rai—to bring Rai's compensation in line with the market rate for CEOs of similarly-situated companies.

116. Rai's employment agreement was nearly identical to other contracts Oura entered into with other Company officers.

117. For example, Chapp's agreement provided the following terms and conditions:

a. He would be COO, based in San Francisco, and would commence working on "April 1st, 2019" (despite the fact Chapp began working for Oura prior to April).

b. His salary would be $200,000 a year, and would increase to $300,000 on the date of the next financing event or on December 31, 2019, whichever came first.

c. Chapp would receive 46,500 shares "in the form of options upon board approval at the next board meeting," which would vest over a four-year period with a one-year "cliff." The options would vest in 25% of the Granted Shares after 12 months of service, and the balance would vest in equal monthly installments over the next 36 months."

COMPLAINT AND DEMAND FOR JURY TRIAL

d.  Chapp would also receive an additional 46,500 shares in the form of options upon an option pool refresh, to be approved by the board, which would vest in the same schedule set forth for Rai above.

e.  Likewise, Chapp would be entitled to a severance payment equal to nine months of his base salary in the event he was terminated without cause.

118.  A similar standard form contract was also entered into in or about July 2019 with Chris Becherer, who was hired as Oura's Head of User Experience and Product Marketing. Becherer also received a stock options grant that vested in the same schedule as that of Rai.

119.  Oura's Board of Directors did not approve the employment agreements of either Chapp or Becherer, as per standard company protocol.

120.  Oura placed all three executed employment agreements in the Data Room.

121.  In or around August of 2019, Oura shared its Data Room with Forerunner and the other Series B investors. From that point on, the Data Room was freely available to the Board and to potential investors.

122.  Additionally, counsel for Gradient Ventures, one of the co-leads in the Series B financing, reached out to Rai after viewing the Data Room to discuss and understand his overall compensation, including his options.

123.   During the Series B round of financing, Rai had a number of conversations with Kim regarding the need to return his equity percentage to five percent—consistent with the Independent Contractor Agreement—in light of the new pool.

124.  Upon information and belief, Kim also discussed the Cap Table (and Rai's compensation) with Ahopelto and Shuman.

125.  By the end of October 2019, upon information and belief, the Board of Directors had signed off on all documents in the Series B data room, which included Rai's Agreement.

**E.    The Series B Financing Event, A "Qualifying Event," Closes in October 2019.**

126.  The Series B financing closed in October 2019, bringing $28 million dollars of investment to Oura.

COMPLAINT AND DEMAND FOR JURY TRIAL

127. The closing of the Series B investment constituted a qualifying "Financing Event" under the terms of the Agreement.

128. On November 14, 2019, the Board of Directors met and appointed Kim as Chairperson, replacing Lin.

129. Lin remained on the Board, which also included Ahopelto, Lahtela, Rai, Shuman, and Jesse Dorogusker.

130. Kim, Lin, Ahopelto, Lahtela, Rai, Shuman, and Dorogusker were all present at the November 14, 2019 meeting.

131. That same day, the Board voted to grant Chief Product Officer ("CPO") Becherer and COO Chapp their options, which mirrored their respective employment agreements.

132. The options were backdated so that vesting would begin earlier.

133. For instance, even though the Board meeting was in November, Chapp's vesting was deemed to have commenced on April 1, 2019, as specified in Chapp's employment agreement.

134. The Board noted in its November 14, 2019 minutes that "there are weighty financial reasons for the issue of option rights in accordance with the above table as such options are granted as part of the Company's personnel compensation and incentivization program."

135. The Board also noted that Rai had not been paid during the first year of his work at Oura "and thereafter the annual salary had been approximately USD 100,000," and "resolved to increase the annual salary of (i) the Managing Director/CEO Harpreet Rai to USD 300,000 and (ii) COO Michael Chapp to USD 300,000."

136. The Board's approval of an increased salary of $300,000 after the next financing event was in accordance with the terms of Rai's Agreement.

137. The Board's approval of an increased salary of $300,000 after the next financing event was also in accordance with the terms of Chapp's employment agreement.

138. The Board took no action on Rai's grant of stock options.

DYNAMIS LLP

COMPLAINT AND DEMAND FOR JURY TRIAL

139.    Upon information and belief, the reason that the Board did not address Rai's options during that meeting was due to tension with Lahtela, who was unhappy that the Board had removed him as CEO.

140.    Rai's understanding was that the Board would address and backdate his options at a subsequent Board meeting, once the situation with Lahtela had resolved.

141.    Oura set record highs for revenue sales in 2019.

142.    Oura did not issue the formal options grants to Becherer and Chapp until December 2020, with vesting retroactive to dates prior to November 2019. This delay was consistent with Oura's standard practices and procedure, wherein the Board would reach an oral agreement, but would take months (or longer) to generate a document memorializing the agreement, which would then be retroactive.

143.    Rai received a year-end bonus in early 2020, for the first time.

**F.      Rai Spearheads Oura's Dizzying Success, Including Series C Financing.**

144.    Rai led Oura until December 2021. During that time, Oura grew to over 400 employees and experienced strong revenue growth, despite the significant challenges posed by the pandemic.

145.    For example, in October and November of 2021, Oura earned $20M of revenue. When Rai had joined Oura, the company's revenues were approximately $100,000 per month.

146.    While Oura's initial CEO had struggled to secure financing, Rai secured over $200 million in financing during his tenure at the helm of Oura.

147.    Rai worked extensively to secure financing. In addition to investments from his family and close friends, Rai secured multiple name-brand investors and oversaw business-to-business sales of Oura Rings to approximately thirty sports teams, including teams from the National Basketball Association ("NBA") and the National Association for Stock Car Auto Racing, LLC ("NASCAR"), and organized numerous academic studies, including a study with the University of California San Francisco about the wearables' potential in early-illness detection of COVID-19.

DYNAMIS LLP

**COMPLAINT AND DEMAND FOR JURY TRIAL**

148.    Rai ultimately led Oura through three rounds of financing, all of which resulted in significant shareholder return, culminating in the Series C round of financing, in or about January 2021, at $99.63 per share.

149.    As part of raising funds in a Series C round, Oura created a data room specific to Series C. Once again, Rai's Agreement was put into the data room, accessible to the entire Board.

150.    Because Oura did not have a Chief Marketing Officer ("CMO") at the time, Rai also worked diligently to advertise and market the Oura Ring.

151.    Rai grew the company's sales to an average of more than 2,000 Oura Rings per day. When Rai joined the company, its gross profit margins were approximately 40%; during Rai's tenure as CEO, those margins grew above 60%.

152.    As CEO, in addition to increasing sales, Rai also focused on improving the quality of the Oura Ring—Oura's only product.

153.    Although Oura's prior management team had published only one peer-reviewed paper, under Rai's tenure, Oura published ten peer-reviewed scientific publications, indicating that the Oura Ring's sensors outperformed Oura's competitors in various measures for wearable devices (such as Oura's ability to measure the user's heart rate, heart rate variability, oxygen, and even hormonal changes indicative of pregnancy).

154.    As a result of Rai's hard work (and that of the team that he managed), Oura's share price increased from approximately $7 in June 2018 to approximately $100 by December 2020.

155.    Rai also recognized that Oura's sales had suffered due to the significant amount of time that passed between the launch of the second-generation Oura Ring and third-generation Oura Ring.

156.    Rai worked tirelessly to ensure that the launch of the third-generation Oura Ring—slated for October 2021—was a success, including marketing and advertising.

**G.    Rai Attempts to Secure the Stock Options Owed to Him.**

157.    By early 2021, Rai still had not received the formal options grant award documents, from the Board, as set forth in his Agreement.

158.    Rai repeatedly raised the issue with Board Chairperson Kim and Board Member Shuman, requesting that the Board formally approve his option grant before his initial tranche of options vested.

159.    On February 24, 2021, Rai scheduled a meeting with the Board to discuss the issue. Kim assured Rai that the Board would form a Compensation Committee (the "Compensation Committee") that would address the status of his options grant.

160.    Rai's options from his Independent Contractor Agreement fully vested on May 17, 2021.

161.    Rai became increasingly concerned that the Board's newly-formed Compensation Committee had not voted on his options despite its prior promise to do so.

162.    On or about September 10, 2021, Rai met with the Compensation Committee and inquired as to when the Board would issue the documentation that he needed for his options to vest on time, in accordance with Rai's Agreement.

163.    Present at that meeting were Kim, Shuman, Ahopelto, and Chapp.

164.    The Board deferred discussion on the topic until September 14, 2021.

165.    The Compensation Committee had previously requested compensation comparisons so that the Board could successfully adjust compensation to be in-line with similar companies. The Compensation Committee further indicated that it would target compensation at Oura to be in-line with the 50th percentile band in the industry.

166.    On or about September 13, 2021, the COO, Chapp, sent a spreadsheet to the Board entitled "Oura Exec Comp Proposal."

167.    The spreadsheet compared the salaries and options of the executives with the 75th percentile bands (for salary) and 50th percentile band (for equity).

168.    The spreadsheet noted that Rai's salary was well below the 75th percentile target band (which was $549,000) and proposed that Rai's salary be increased to $400,000, with a maximum bonus of $80,000.

COMPLAINT AND DEMAND FOR JURY TRIAL

DYNAMIS LLP

169.    It also noted that Rai's equity stake was substantially below the Target Equity (50th percentile band) for Rai's position, which was 5.23-5.58% of all outstanding shares, and proposed increasing Rai's options to 5.22%, or 259,922 shares (an increase worth more than $15 million).

170.    The spreadsheet also contained proposals to increase compensation for other executives, including Chapp and Becherer, and noted that the Board "should have" evaluated executive compensation in December 2020 or January of 2021.

171.    Rai met with the Compensation Committee on September 14, 2021.

172.    At that meeting, the Compensation Committee ignored Chapp's proposal and instead proposed a new grant of 1.1% of outstanding shares, which would have increased Rai's options to only 3% of equity. The Compensation Committee offered to Rai another 1% of equity when Oura became valued at $5 billion, and another 1% when, and if, Oura reached a valuation of $10 billion.

173.    The above-noted valuation figures would be in the top 0.1% of all venture returns for all companies, and at the time, had never been achieved by any other wearable company.

174.    The Compensation Committee's "offer" did not align with Rai's Agreement and did not recognize all he had done for Oura in the 3½ years since he took over as CEO.

175.    Rai reminded the Compensation Committee that his compensation had been fixed during the Series B financial round in October 2019.

176.    Kim, however, claimed that it would have been too difficult to document Rai's option grant in October 2019 because Oura's founders were still at the company, and stated that the Board was under no obligation to do so following the founders' departures.

177.    Other members of the Compensation Committee indicated that they were aware that Rai's prior shares had vested, but claimed to be unaware of the option grant in Rai's Agreement.

178.    Chapp, who was present at the meeting, confirmed that Rai's signed Agreement existed and that Chapp was aware of it.

179.    At the end of the meeting, Kim indicated that the Board would get back to Rai quickly to schedule a follow-up conversation on Friday, September 17, or Monday, September 20.

DYNAMIS LLP

180.    Prior to these meetings, Rai had no reason to believe that Oura would not honor its promise to grant him stock options (or that the Board would refuse to discuss it). As explained, the Board had gone through the procedural formality of granting options for Chapp and Becherer, who had been hired into their executive roles after Rai began his position as CEO. Rai understood that the vesting schedule would be made retroactive to October or November 2019, just as Oura had done for Chapp and Becherer.

181.    Nor did Rai have any reason to believe that Oura would assert that the Agreement he had executed two years earlier with the Chairman of Oura's Board was invalid. The Agreement was stored in the Data Room, where it was visible and accessible to the Board, including through two rounds of funding (Series B and C), alongside the respective employment agreements for Chapp and Becherer. Moreover, Kim—now the Board's Chairperson—had represented to Rai, during the negotiations over the Series B financing, that he would be allocated additional options to bring his equity share back to 5%. Kim had even sent to Rai a spreadsheet that outlined her own calculations of options allocations, which provided that Rai would be entitled to additional equity following the closing of Series B financing.

182.    Furthermore, Oura had followed through with all other conditions in Rai's contract: Rai had been granted benefits (which he did not have as an independent contractor), including health insurance and PTO, and the Board had raised his salary to $300,000 annualized, in accordance with the timeline outlined in the employment agreement.

183.    Two days after the meeting, Chapp emailed Rai the signed Agreement, and Rai forwarded the Agreement to the Board.

184.    However, the Board never followed up with Rai to schedule a meeting. Instead, on Friday, September 17, the Compensation Committee informed Rai that they would "process" his feedback and that company counsel would be involved in the discussions.

185.    Rai then became concerned that the Board was using these excuses to deny him options now that the company was successful and his already-earned shares were worth substantially

COMPLAINT AND DEMAND FOR JURY TRIAL

more than they would have been in 2019. In short, Rai worried that he was becoming a victim of his own success.

186.     Rai nevertheless continued to believe that Oura would make good on the terms of his written Agreement.

187.     Rai, through counsel, reached out to Oura's counsel towards the end of September to ensure that the Board was following up and providing him with his options grants.

188.     The Board met on September 28, 2021 for more than three hours, but was unable to reach a resolution as to Rai's compensation. Instead, the Board promised to meet again and generate a proposal by October 6, 2021.

189.     During this time-period, Rai worked significant hours to launch Oura's third-generation Ring. Rai had invested substantial time and energy into growing the company, hiring employees, and improving the product. Rai wanted to see the launch succeed.

190.     The launch of the third-generation Oura Ring was a turning point for the company—moving from a hardware-only business model to a hardware-and-subscription model. Rai spearheaded this transition, playing a key role in designing the mechanics of the subscription service and determining subscription pricing.

191.     Rai also led all aspects of the marketing launch, including media campaigns, social media channels posts, email promotions, app notifications related to the launch, press interviews, and posts by influences and partners.

192.     David Shuman, one of Oura's board members, assured Rai that the compensation issue would be resolved after the launch of the third-generation product.

193.     Rai emailed the Board with various options related to the compensation dispute. He included several proposals, including one option that would result in Rai continuing as CEO, with appropriate options and compensation, and two other options that would involve resignation, including certain conditions related to severance compensation, equity grants, and timing. Rai included a deadline of 5 p.m. on October 29, 2021 for the Board to accept one of these offers.

194.     October 29 came and went with no further communication from the Board.

COMPLAINT AND DEMAND FOR JURY TRIAL

195.    Meanwhile, Oura unveiled the third-generation Oura Ring, which was overwhelmingly successful.

196.    Oura's transition to a subscription-based model resulted in significantly higher revenues. On average, an Oura customer will use a single Oura Ring for more than two years. Adding subscription revenue increased the revenue per user from $330 to $448. Because subscription revenue commands a nearly 90% profit margin, the contribution profit (gross profit minus cost of marketing and acquisition) of each user doubled from $100 per user to $200 per user over that two-year period.

**H.    Oura Terminates Rai's Employment.**

197.    On November 11, 2021, Kim emailed Rai and asked if Rai could meet with Kim and Lin in person on Friday, November 12.

198.    Rai responded that he was no longer in San Francisco (although he had previously been in California attending a launch party and an event for Oura), but offered to meet on Monday, November 15 or Tuesday, November 16 instead.

199.    Kim replied and indicated that November 12 "would be best."

200.    Rai spoke with Kim and Lin on the afternoon of November 12, 2021. During that conversation, Kim and Lin informed Rai that he was being terminated, and that Oura was purporting to accept his resignation.

201.    Plaintiff responded that he had not resigned.

202.    The conversation of November 12, 2021 evinced that Oura had determined not to approve the stock option grant included in Rai's Agreement. Instead, Oura would continue to wrongfully prevent the Board from approving Rai's options.

203.    After the phone call, Rai followed up with an email to Kim and Lin, documenting that they had attempted to pressure him into resigning over terms that he had not proposed or accepted. Rai noted that, as discussed, the Board would send separation terms to their respective counsel.

DYNAMIS LLP

204.   Rai also followed up, in writing, on November 13, reaffirming that he had not resigned from his position as CEO.

205.   Kim replied confirming that "a separation has occurred" and attempted to craft "a narrative that includes you resigning as of Friday."

206.   Rai, however, made clear to Kim and other board members that he was not resigning. In subsequent communications, Rai stated very clearly: "i'll cooperate with messaging (including agreeing to resign and say so) *if and only if* we reach agreement on severance terms – and I am ready, willing, and able to work on that project right away." Rai suggested that his counsel meet quickly with Oura's counsel to discuss the severance offer.

207.   However, Oura would not negotiate any potential severance plans that would include the options to which Rai was entitled.

208.   On November 30, 2021, Kim sent out a confidential internal email announcing that Rai would be "stepping down" as CEO.

209.   On December 1, 2021, Oura publicly announced that Rai was "stepping down as CEO" and that Chapp would take over as interim CEO.

210.   Oura provided no cause or reason why Rai's employment was terminated.

211.   Oura had no cause or reason to terminate Rai's employment.

212.   Rai was therefore entitled to severance pay totaling nine months of his current salary, as provided by the Agreement. As of December 1, 2021, that amount totaled $225,000.

213.   Oura refused to provide Rai with any severance pay unless he released all potential legal claims against the company. This requirement violated the terms of the Agreement, which entitled Rai to severance for no additional consideration.

214.   Kim also noted in her email to Rai that "the transition will occur whether or not we reach agreement on the terms" of the severance proposal.

215.   Oura nonetheless provided Rai with COBRA, and paid out his accrued vacation days, as provided by the Agreement.

DYNAMIS LLP

COMPLAINT AND DEMAND FOR JURY TRIAL

216.    Several months after Rai's termination, in April 2022, Rai, through counsel, attempted to re-engage with the Board to determine a mutually acceptable separation agreement. In response, Rai's counsel was told that any offers by the Board had expired.

217.    Thus, Rai has never received the severance pay or the options to which he is entitled under his Agreement.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Breach of Contract)

218.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

219.    Plaintiff and Defendants entered a valid and enforceable agreement governing Plaintiff's employment as Oura's Chief Executive Officer.

220.    Plaintiff promised to provide the services of Defendants' Chief Executive Officer.

221.    In exchange, Defendants promised to compensate Plaintiff, including by granting him additional shares in the form of options to bring his ownership in Oura to 5% upon a capital raise of €10 million, and to pay him severance of nine months of his base salary if Oura terminated him without cause.

222.    Plaintiff fully performed the services of Chief Executive Officer. Oura executed a capital raise that well exceeded €10 million in October 2019. All conditions precedent to Oura's performance were met.

223.    But Oura refused to perform. Oura refused to grant Plaintiff the additional shares he was owed upon the execution of a €10 million capital raise. On November 12, 2021, Oura confirmed that they would refuse to even vote on Plaintiff's options despite the execution of the €10 million capital raise.

224.    Further, on November 12, 2021, Oura terminated Plaintiff's employment without cause, yet refused to honor the severance agreement in Plaintiff's employment agreement.

DYNAMIS LLP

**COMPLAINT AND DEMAND FOR JURY TRIAL**

225.     As a result of Oura's breach, Plaintiff has suffered damages in an amount to be determined at trial, that is at a minimum the amount of the current value of the Oura stock to which he was entitled, plus $225,000 in unpaid severance pay.

**SECOND CAUSE OF ACTION**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

226.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

227.     A covenant of good faith and fair dealing is implied in every contract in California.

228.     Plaintiff and Defendants entered a valid and enforceable contract. Plaintiff promised to carry out the functions of Chief Executive Officer, and Defendants promised, among other items, that Plaintiff would be compensated with 5% of equity in Oura.

229.     Plaintiff performed his duties under the contract in accordance with the implied covenant of good faith and fair dealing. All conditions precedent to Defendants' performance have been satisfied.

230.     But Defendants have refused to perform.

231.     Defendants materially and substantially breached the implied covenant of good faith and fair dealing by refusing to hold a meeting on Plaintiff's options, which Oura was materially required to do under the contract, despite representing repeatedly to Plaintiff that it would do so (and thus, preventing Plaintiff from obtaining the benefit of the bargain).

232.     By acting without legitimate basis and refusing to perform under the contract, after Defendants had already gotten the full benefit of the contract, Defendants breached the implied covenant of good faith and fair dealing.

233.     Defendants' breach caused Plaintiff damages in an amount to be determined at trial. These damages are the natural and probable consequences of Defendants' refusal to perform under its agreement.

**THIRD CAUSE OF ACTION**
**(Unjust Enrichment)**

234.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

COMPLAINT AND DEMAND FOR JURY TRIAL

235.    In the alternative to Plaintiff's breach of contract claim, Plaintiff is entitled to recover in *quantum meruit* if it is determined that either a valid and enforceable contract does not exist, the existing contract does not cover the subject matter of the dispute between Plaintiff and Defendants or the existing contract is void, invalid, or unenforceable.

236.    Defendants hired Plaintiff to serve as Chief Executive Officer of Oura.

237.    Plaintiff served as Chief Executive Officer for the benefit of Defendants.

238.    Plaintiff saved Oura from its demise and built Oura into a world-class company that today is worth approximately $11 billion.

239.    Defendants have repeatedly and publicly recognized that Plaintiff's services were instrumental to Oura's success. Defendants' knowingly and voluntarily accepted and benefited from Plaintiff's services.

240.    Defendants were aware at all relevant times that Plaintiff was providing the services of Chief Executive Officer at a steep discount from the market rate for such services. Defendants knew that Plaintiff expected to be compensated with equity in Oura. Defendants were aware that Plaintiff had executed a written agreement that memorialized this expectation.

241.    Defendants refused to provide Plaintiff with equity or otherwise pay Plaintiff the full value of his services of Chief Executive Officer. Defendants have refused to pay Plaintiff the full value of the services he rendered, for more than three years, at the helm of Oura.

242.    Defendants have been unjustly enriched by Plaintiff's services. Plaintiff is entitled to recover damages in an amount to be determined at trial, but no less than the 5% equity he was promised by Oura.

## FOURTH CAUSE OF ACTION
### (Promissory Estoppel)

243.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

244.    Pleading in the alternative, if there was no valid and enforceable contract, the contract does not cover the subject matter of the dispute, or the contract is for some reason found to be void,

DYNAMIS LLP

COMPLAINT AND DEMAND FOR JURY TRIAL

invalid, or unenforceable, then the agreements should be enforced under the doctrine of promissory estoppel.

245.    Through Kevin Lin, Eurie Kim, and other senior leadership, Defendants promised Plaintiff that he would be granted 5% stock options upon the completion of the Series B round of financing. These promises were memorialized in Plaintiff's written employment agreement.

246.    In reliance on Defendant's promise to provide him with stock options, Plaintiff provided services at significantly lower compensation than he would otherwise have agreed to. Plaintiff has thereby reasonably and justifiably relied on the promise to his detriment.

247.    It was foreseeable that Plaintiffs would rely on Defendant's promise. Defendants knew that Plaintiff was providing the services of a Chief Executive Officer at a salary that was significantly below the market rate because he was relying on the promise of stock options. Defendants also knew that Plaintiff's grant of stock options was significantly below the market rate.

248.    Defendants repeatedly represented to Plaintiff that the Board would grant the stock options and backdate them, as it did for previous employees, yet it refused to do so. Oura realized that the stock options were worth substantially more money than anticipated, and refused to honor its agreement (despite the explicit documentation in Plaintiff's Employment Agreement).

249.    Injustice can be avoided only by enforcing Defendants' promise of equity. As Oura's Chief Executive Officer, Plaintiff transformed Oura into a wildly successful company that was valued at over $2.55 billion immediately after Plaintiff's departure and is currently valued at around $11 billion. Oura would not be the company that it is today without Plaintiff's efforts.

250.    Oura's refusal to honor its promises has caused Plaintiff significant damages in an amount to be determined at trial.

DYNAMIS LLP

1

2
## **PRAYER FOR RELIEF**

3
WHEREFORE, Plaintiff respectfully requests that the Court award Plaintiff judgment

4
against Defendants and award the following relief:

5
(a) Compensatory damages in an amount to be determined at trial;

6
(b) Restitution for the value of the services that Plaintiff provided to Defendants;

7
(c) Pre-judgment interest;

8
(d) Post-judgment interest;

9
(e) Costs of suit, including attorneys' fees and expenses; and

10
(f) All other and further relief as the Court deems just and proper.

11

12
## **DEMAND FOR JURY TRIAL**

13
Plaintiff hereby demands a trial by jury on all issues so triable.

14

15
Dated: November 7, 2025                                        **DYNAMIS LLP**

16
                                        By:     */s/ Constantine Economides*
17
                                                CONSTANTINE ECONOMIDES
                                                ERIC ROSEN
18
                                                KAITLYN GERBER
                                                TYLER FINN
19

20
                                                *Attorneys for Plaintiff Harpreet Singh Rai*

21

22

23

24

25

26

27

28